[Crim. No. 1520. Second Appellate District, Division One.—November 1, 1927.]

THE PEOPLE, Respondent, v. F. J. HUDSON, Appellant.

A. S. Maloney and Joe Rensch for Appellant.

U. S. Webb, Attorney-General, John L. Flynn, Deputy Attorney-General, and Warner I. Praul for Respondent.

HOUSER, J.—Defendant appeals from a judgment of conviction of the crime of robbery and from an order denying his motion for a new trial.

From the record it appears that the complaining witness was an employee in charge of a gasoline and oil service station located at the town of Upland, in San Bernardino County, and in that connection he had the custody of the cash receipts of the business conducted by him; that at about 8:20 o'clock P. M. on the evening of March 1, 1927, he closed the service station at which he was employed, placed the cash receipts of the day, amounting to the sum of approximately $89, in a leather pouch which he carried in one hand, and started to go up an alley to enter his home from a rear door. At a point in the alley opposite the rear entrance of a garage which abutted on the alley two masked men proceeded to and did rob the employee of the $89 contained within the leather pouch. In perpetrating the robbery one of the robbers, who had a rifle in his possession, approached the employee from one side; the other robber approached the victim "from behind" and searched the employee, who suddenly threw away the money which he had in the pouch, which was shortly thereafter found by the robber. The employee was then ordered "to beat it down the alley." It further appears that the employee had some acquaintance with the men whom he supposed were the robbers. Immediately after the robbery occurred the employee reported to the police officers that "one of them was Matthis, and *I thought one was Hudson* (the defendant)." Three days thereafter the employee received a letter from defendant inclosing a one-dollar bill in payment of a balance of ninety-odd cents which defend-

ant owed to the proprietor of the service station for supplies furnished to defendant. On that dollar bill was a red smear or blot, and by such mark was recognized by the employee as a part of the money of which he had been robbed. A few days later, and after the employee had sworn to a complaint charging defendant with the crime of robbery, defendant visited the home of the employee at about 9:30 o'clock P. M., where he remained approximately fifteen minutes. At that time defendant "was nervous"; he stated that "they have arrested Matthis," and with reference thereto inquired of the employee "Did you know it was him?" and "You are sure, are you?" to both of which questions the employee answered "Yes." Although the father of the employee was present throughout the time of the visit made by defendant to the employee, no charge or suggestion resembling an accusation was made to defendant by either the employee or the father that defendant was in any way connected with the commission of the crime of robbery in question; nor was any effort made at that time to arrest or detain defendant. Ten or fifteen minutes after defendant had concluded such visit the employee went to the police headquarters at Upland and there told a deputy sheriff "about it." At the trial of the case, on cross-examination the employee stated in substance that before the robbery occurred, the last time he had seen defendant was on the sixth day of February, which would have antedated the robbery by twenty-three days. In response to the question as to whether the employee ever saw defendant after the sixth day of February, until he again saw him at the home of the employee as hereinbefore narrated, the employee stated, "Never saw him for sure." The deputy sheriff to whom the employee reported the fact concerning the receipt by him from defendant of the dollar bill which had upon it a smear or blot was a witness on the trial of the action. Regarding the identification by the employee of defendant as being one of the robbers, the deputy sheriff testified in part: "Q. When did you first receive information and from what source that Hudson (the defendant) and Matthis were claimed to have committed this burglary, robbery? A. The first information in regard to the names was from Upland, and then the next day I

talked to Sabin (the employee) himself, and he told me *who he suspected."*

Other questions propounded on cross-examination to the employee, together with his answers thereto, illustrate the lack of certainty in the mind of the employee with reference to his identification of defendant as one of the men who "held him up": "Q. . . . You kind of guessed that was Floyd Hudson (the defendant) when you told the officer? A. I wasn't certain; I thought it was him, but I wasn't sure. Q. And you had known him and talked to him and knew his voice, but you told the officer you were not sure of him? A. No, sir, *because he didn't talk that night."*

It also appears that the employee only swore to a complaint charging Matthis and defendant with the crime of robbery four days after its occurrence; which delay, however, is explained by the employee by the fact that he did so as soon as he was requested so to do by the police officers, following the receipt by the employee from the defendant of the dollar bill with a smear or blot on it.

The defense to the accusation against defendant consisted of evidence to the effect that at the time the crime was committed he was at a place located about seven miles from the town of Reedley, 280 to 300 miles distant from the city of Upland, the scene of the robbery. One witness, apparently of intelligence and probity, testified positively to the fact that at about the hour of 10 o'clock on the morning preceding the day of the robbery the defendant came to his home (which was located, as aforesaid, 280 to 300 miles distant from the place where the robbery occurred) and there remained until 10 o'clock A. M. the following day, at which latter time defendant left the home of the witness, returning thereto the next day between 1 and 2 o'clock in the afternoon, and that thereafter for a period of several days he did not leave the home of the witness except for the purpose of making short business or social trips to a near-by town. The witness further testified that immediately after defendant was arrested, which occurred ten days after the robbery took place, from various things that had happened within his knowledge, he was able to accurately determine the date when defendant first came to his home. Another witness testified to the fact that she

met defendant at the postoffice in the city of Madera, which is located approximately 300 miles from the town of Upland where the robbery occurred, at about 2 o'clock on the first day of March, 1927, and left him at 9 o'clock in the evening of the same day. The witness further testified that during the time that she was with defendant he had some repairs made on his automobile, and that on that day she gave him $10 and $12 on the day following. From records of the garage where the repairs were made, it appeared that the repairs were made on the second day of March, 1927.

Defendant denied his guilt, and accounted for the dollar bill which he sent to the employee of the service station by the statement that he received it from a storekeeper at the town of Herndon, where he mailed the dollar bill to the employee. He also testified that on February 28th, at Madera, he wrote a letter to Mrs. Iva Hooper, who testified to having received such letter on the same day on which it was written, and that the envelope in which the letter was inclosed, and which was produced in court, bore the postmark date "1927, February 28."

The principal point made by appellant for reversal of the judgment and order denying defendant's motion for a new trial is that, over defendant's objection, the trial court erred in admitting in evidence the testimony given by the arresting officer relating to the commission of another offense by defendant. In making his opening statement to the jury the district attorney included therein the following remarks:

"I think the evidence will show that this defendant had been living in the vicinity of Upland, and on the night of March 2d he drove into a garage at Merced in company with a Mrs. Iva Hooper, who is a married woman, whose husband lives up in that country, but who had formerly lived in the same house down here in Upland with this defendant, showing that the defendant went from the scene of the robbery, which was about 8:15 or around 8 o'clock on the night of March 1st, directly back up to that country and associating himself with a woman, a married woman, who had prior to that time a short time lived with him or in the same house down here in the city of Upland, where her husband came down and took their little baby two or

three or four months of age away, and that she went back up there and corresponded with this defendant. . . . And I think we will show to you that this defendant was using a certain Ford touring automobile which was equipped with stolen parts from other automobiles at the time he committed this burglary; that he and this fellow Matthis had visited from time to time, or called from time to time—"

An objection by defendant having been made to such remarks, particularly regarding the stolen .part from other automobiles, the judge of the trial court instructed the jury to "disregard the statement made by counsel with respect to the equipment of the automobile with stolen parts."

In the course of the trial, on the theory that evidence was admissible to show how and in whose car defendant had been traveling from place to place, and what, if anything, on being arrested, defendant had said with reference to the charge preferred against him, the trial court, over defendant's objection, permitted the arresting officer to testify as follows:

"A. What was the question before that? Q. The question before that was who was present and whether there was any promises made, and I told you to relate the conversation. What did he say? A. The main part of the conversation was about the car. I asked whose car it was. Mr. Maloney: Objected to as incompetent, irrelevant and immaterial. The Court: Overruled. A. He said it belonged to Iva Hooper, but she had transferred it to him. I asked him about the running gear part of it, and he said that was taken from a car stolen from Pomona. Mr. Maloney: Objected to as incompetent, wholly irrelevant, and I ask that it be stricken out. The Court: Motion denied; overruled. A. I asked him if Matthis was with him when he stole this car, and he said no, Ronald had nothing to do with it, only he helped him change the body from one car to the other. He said he tried to change the engine, but he wasn't mechanic enough to change the numbers on it. I asked if Floyd Sabin had any connection with stealing any of these cars, or accessories, and he said no. In regard to this robbery on the first of March, he told me he left Upland Saturday night prior to that, and had not been back until just

before he came down to the valley. He said, 'Had I known you fellows were after me, you would never have found this car. I would have set fire to it and burned it up, and gone on afoot.' . . . Q. What was done with that car? A. I turned the body and engine over to his brother, and the chassis and wheels and battery and some accessories over to the man who owned it, Mr. Cappel, of Chino.''

The law is well settled by a host of authorities that in circumstances such as are here present the evidence to which defendant objected was inadmissible on a trial of defendant on the charge of robbery. (8 Cal. Jur., sec. 167, and cases cited.) No relationship whatsoever was shown to exist as between the crime of robbery for which defendant was being tried, and the offense of larceny which the questioned evidence tended to prove had also been committed by defendant. It had no tendency to prove the commission of the crime for which defendant was placed on trial.

In the instant case the identification of defendant as one of the men who committed the crime in question was not wholly satisfactory. Although on the trial the victim of the robbery unhesitatingly testified at one time that defendant was one of the "parties" that "held him up," it will be remembered that the robbery was committed at about 8:20 o'clock P. M.; that the robber supposed to be defendant was masked, approached the victim "from behind" and that "he didn't talk that night." Further testimony given by the employee shows that immediately after the crime was committed he merely suggested defendant as a person "whom he suspected," and that he "never saw him (defendant) for sure; . . . I wasn't certain; I thought it was him, but I wasn't sure." It is therefore apparent that the identification of defendant as one of the robbers became a certainty in the mind of the victim from some circumstances which occurred subsequent to the robbery, and hence that the identification of defendant arose, not primarily from a sense of sight or of hearing of the employee, but that it was the result of deductive reasoning. On the other hand, the alibi of defendant, while from his standpoint at least, not all that might have been desired, nevertheless was of that quality which in ordinary circumstances might be expected to create a reasonable doubt in the minds of the members of the jury regarding the guilt of defend-

ant. In such a situation the unchecked, although prejudicial, remarks made by the district attorney on his opening statement to the jury regarding the alleged fact that defendant had been ''associating'' with a married woman not the wife of defendant, together with the erroneous admission of evidence which tended to establish the commission by defendant of the separate crime of larceny, may have been sufficient to turn the scale against defendant, with the result that he was found guilty of the crime of robbery. This court is not unmindful of the provisions of section 4½ of article VI of the constitution, relating to the duty of the appellate court, notwithstanding error in the course of the trial, to affirm a judgment, ''unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.'' After such examination, including a consideration of the evidence relied upon by the prosecution, this court is of the opinion that the error of which complaint is made by appellant deprived defendant of a fair and impartial trial, which may have resulted in ''a miscarriage of justice.'' While for the stability of the government it is important that the laws should be enforced and that guilty men should be punished for their crimes, it is of much greater importance that justice should be done in that every accused person should have a fair trial on the charge preferred against him. It is most apparent that any substantial departure from such principle would amount to a menace to our institutions.

Although other alleged errors occurring on the trial are suggested by appellant for the consideration of this court, it becomes unnecessary to devote attention to them.

It is ordered that the judgment and the order denying the motion for a new trial be and they are reversed.

Conrey, P. J., and York, J., concurred.