[Crim. No. 5672. First Dist., Div. One. July 27, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. CLAUDE
RAY, JR., Defendant and Appellant.

938

Barbara Ashley Phillips, under appointment by the Court of Appeal, and James M. Weinberg for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Robert R. Granucci and Jerome C. Utz, Deputy Attorneys General, for Plaintiff and Respondent.

SIMS, J.—Defendant has appealed from a judgment sentencing him to life imprisonment following jury verdicts which found him guilty of murder in the first degree in connection with the charged infanticide of his seven-year-old daughter, and thereafter fixed the penalty at life imprisonment.

Defendant asserts that the trial court erred in proceedings for the selection of the jury, in rulings which admitted evidence over his objections, in the failure to grant a mistrial because of a concededly prejudicial unresponsive answer volunteered by a witness for the prosecution, in the failure of

the court to prevent the jurors from observing him handcuffed, and in instructions given and refused. He also urges that the prosecutor was guilty of prejudicial misconduct in his argument to the jury. An examination of the record, upon which his contentions are necessarily based, in the light of established principles of law, reveals no prejudicial error, and the judgment must be affirmed.

*Statement of Facts*

The defendant's seven-year-old daughter Renay, and her nine-year-old sister Jeanette, disappeared on Monday, October 4, 1965. On Sunday, October 10, 1965, defendant was arrested, following the discovery of Renay's body.

The body was found at Schooner Gulch, which is located about three and one-half miles south of Point Arena on the Mendocino County coast. It was found accidentally by a family looking for seaweed. The body was at the bottom of a 90-foot cliff, among some rocks, where the tide washes in and out. It could not be positively stated that the body had always been in this position. However, since there was little evidence of destruction of tissue by marine life, the autopsy surgeon concluded the body had not been in the water for a prolonged period. The point where the body was found is difficult to reach, and is not noticeable from the highway. There are several areas near Schooner Gulch, including a turnout directly over where the body was found, where a body could have been dropped directly into the water, and where one could drive a vehicle and not be observed from the road.

The autopsy indicated that the victim had been dead between five to seven days. The cause of death was asphyxiation, probably by smothering. There were bruises on the body that had occurred before death. The autopsy surgeon felt that it was unlikely that the child had fallen from the cliffs to the spot where she was found since there was no evidence of broken bones. There was no evidence that the little girl had been sexually molested immediately prior to her death, but there was evidence of a manual entry of her vaginal tract either some considerable time prior to death or shortly thereafter.

The arrest of defendant and his conviction were based on circumstantial evidence. He was supposed to have taken the children to school in Napa on that Monday morning. The children were absent from school. Defendant before and after the discovery of the body consistently maintained that he had

delivered the girls to school and that, to think things over and look for work, he had taken a ride from Napa out to the coast and north (past Schooner Gulch), inland to Cloverdale, and then returned.

Defendant and his wife, Marlene, were married in 1950. They had five children: Audrey, Thomas, Jeanette, Renay and John. The family had, for the most part, lived in Napa between 1950 and 1965. The marriage was troubled. Defendant was considered a failure. Although it was not brought out until the penalty trial, defendant in 1956 had committed himself to an institution after unconsciously trying to choke one of the children, he had attempted suicide twice, and he had had episodic periods of disorientation. In addition, defendant and his wife had many arguments about their eldest child, Audrey.

As a result of the arguments about Audrey, defendant had, as early as 1959, threatened to kill his wife and children. The family, however, remained together until 1965. In January of that year, Mrs. Ray instituted divorce proceedings and the couple separated. Some two weeks later, defendant told his wife that if she did not return to him he would blow Audrey's head off, and would put them all "six foot under." Audrey was placed in a foster home and defendant returned to his family. In June of 1965, defendant again threatened his family. In August 1965 Mrs. Ray took the children to Salt Lake City, but she returned in about a week and resumed living with defendant.

Sometime in August the Ray family was out driving when they passed Mrs. Ray's mother, her brother, and Audrey driving in the opposite direction. Both cars stopped and Mrs. Ray got out of the car. Defendant told Mrs. Ray to get back in, that she was not to see Audrey anymore. There was an argument, and defendant attempted to drive away and prevent the meeting. However, Mrs. Ray and the children ran from the car. At this point, defendant again threatened the lives of his family.

Mrs. Ray and the children did not return to the family's apartment, and eventually made their home with a Mr. and Mrs. Holland. During a visit to his family at the Holland's, defendant indicated to Mr. Holland that he would rather see his family dead than beggars or bums.

Defendant also indicated to Mrs. Ray's father that he had purchased a gun, and that he was going to do some killing. Mrs. Ray's sister, brother-in-law, and a neighbor heard

defendant either threaten to kill his family or threaten to "kill them all."

Defendant left in September for a visit to Kentucky, his native state, but first stopped at Tuolumne, at Mrs. Ray's mother's house, and asked where his family was. After his mother-in-law refused to tell him, defendant declared: "Well, I will get the girls first and then the boys and then I will get you."

In late September, Mrs. Ray received a call from defendant. He told her he was returning from Kentucky, and asked her to contact a tannery in Berkeley where he had previously worked.

On Sunday, October 3, 1965, the day before the childrens' disappearance, defendant returned to Napa. During that day Mrs. Ray had been in the process of moving from the Holland's to an apartment. Mrs. Ray saw defendant during the day and arranged to meet him at the home of Velva Prince, where Mrs. Ray's father was then living.

Defendant and his wife had another argument at the Prince's, overheard by Mrs. Prince. During the argument, over who was to have the children, defendant told his wife he wanted to see her look at four walls, he wanted her to see how well her mind would stand up to looking at four walls "without any kids." Defendant declared he was going to have the children at least half the time, and, if he could not, he was going to see that his wife did not. Mrs. Ray then agreed that she would leave the children at Mrs. Prince's home for a few days so that defendant could have a chance to be with them.

At the new apartment, with defendant present, Mrs. Ray prepared the childrens' lunches, and clothing for the following day, and gave the defendant one dollar for milk. It was arranged that defendant would take the children to school the next morning, and that if she did not call or go out to the Prince's residence he could pick up the children after school. Defendant, in the company of his son Tom, then returned to the Prince's with the childrens' provisions for the next day. At about 9 p.m. defendant returned to his wife's apartment. Mrs. Ray testified that there was a long conversation in which she told defendant she was going to divorce him, and had no intention of reconciling. Defendant indicated he would get a job and take care of his family, except for Audrey. His wife stated that he declared that no man was going to raise his children or have her. Defendant testified that he and his wife

did not argue that night, and he just wanted to stay together with his family. He did not want his family on welfare. He testified that he and his wife had sexual intercourse. Defendant and his wife agreed that he left the apartment at 4 a.m. Defendant again returned to the Prince's residence, and went to bed.

Defendant was extremely difficult to awake the next morning. He finally got up at 7:45 a.m., took Tom to school, and returned to pick up the girls. Mrs. Prince placed breakfast before the children. She was unsure whether or not Renay had taken any food, but thought that Renay did not eat very much, if at all. Defendant and the girls then left for school.

Two members of the safety patrol at the school thought they saw the Ray Chevrolet pass the school on Monday morning.[1] They did not see the car stop or anyone get out of it. Another crossing guard, who did not see the car, thought she saw two little girls, of Renay and Jeanette's ages, walking away from the school toward a shopping center, on that Monday. She did not know the Ray children, and testified she would not know the two Ray girls again if she saw them. The two little girls did not appear in their classes that morning, and never were seen alive again.

Defendant testified that he set out on a long drive, after dropping the two children at school. The drive took him through Petaluma, to the coast, up to Point Arena, back through Boonville and Cloverdale and to Napa. He was driving around to think things over, and to look for a job.

A former coworker of the defendant thought he saw the defendant, and possibly another occupant, in the car around 11 a.m. in Bodega Bay. This witness' testimony at the trial conflicted with two earlier stories he told about the same event.

A little before noon[2] defendant stopped in Gualala and purchased $1.00 worth of gas. The service station operator did not notice anyone else in defendant's car. The car had

[1]The safety patrol guards were 11 years old. There was an assertion by the prosecution that the children might have been confused as to the day they saw the defendant's car. (The car is a rather distinctive old blue Chevrolet with a reddish-orange grill.) However, the children indicated that when they saw the defendant's car on Tuesday, they thought they had seen the car the previous morning, October 4th.

[2]The service station operator indicated that defendant came into the station a "little bit before" noon. He defined a little bit as 10 or 15 minutes.

entered the station heading south. Defendant declared he had in fact been heading north, had passed the station, and then came back to get gas. Gualala is south of Schooner Gulch.

Defendant was next seen in Point Arena about 12:40 p.m. A deputy sheriff noticed a car which matched the description of defendant's Chevrolet pass the school where he was on duty. The officer observed the vheicle as it drove north up a hill through the town.

A truck driver saw defendant on the road between Boonville and Manchester, between 1:15 or 1:30 p.m. The two vehicles almost collided. The truck driver declared he had been going about 12 miles per hour and that defendant had been driving ''too fast for the road conditions.'' Defendant inquired about jobs in the county, and about the nearest gas station. The truck driver told defendant that the road was all downhill to Boonville, and his quarter tank of gas should be sufficient to make it. Although the truck driver did not recognize defendant at the trial, their testimony as to the events and the conversation coincided.

Defendant was next seen at a Cloverdale gas station, where he borrowed a nickel to make a collect call to Napa. While in Cloverdale, defendant visited a brake factory where he had previously applied for a job. Defendant did not recall this visit, but a foreman of the factory did remember it.

Mr. Holland, at whose home the Ray family had lived in September, testified that on October 4th, at 2:25 p.m., he received a phone call from defendant who stated he was calling from Cloverdale. Defendant asked him to pick up his oldest son at school, and to tell Mrs. Ray to pick up the other children and take them home.

Mrs. Holland had been notified that the children were absent from school. At 1 p.m., Mrs. Ray was told by her sister of the childrens' absence. She notified Sergeant Randol of the Napa police that the children were missing.

Defendant testified that he finished his trip at 3:40 p.m. He then drove directly to the girls' school. He approached one of the teachers and asked: ''Are Renay and Jeanette here?'' The teacher asked for the childrens' last name, and then told him that the girls got out of school at 2:30 p.m. She suggested that defendant drive along the route the children normally took home. Defendant was ''extremely excited,'' and seemed ''quite nervous.''

At about 4 p.m. defendant visited Mrs. Ray's sister's house, and asked where his wife was. His sister-in-law asked him

where the girls were, and defendant insisted he had dropped them off at school. Defendant then drove to Mrs. Prince's house, where he and the children had spent the previous evening. He told Mrs. Prince that his sister-in-law had asked him what he had done with the girls. He indicated he could not find them, and wanted Mrs. Prince to help search for them.

Defendant then returned to school and talked with the school clerk. He appeared excited and said to the clerk: "Lady, I am nearly crazy. I can't find my children." This visit occurred at about 4:45 p.m.

Police Officer Randol had his first conversation with defendant and his wife around 4 p.m. on October 4th. At this conversation, as hereinafter appears, the police officer informed defendant of his *Dorado* [*People* v. *Dorado,* 62 Cal.2d 338 (42 Cal.Rptr. 169, 398 P.2d 361)] rights.

Randol had his second conversation with defendant at 5:30 p.m. at the police department. The defendant told Randol that he had dropped the girls off at school at 8:45 a.m., and that he had taken the trip described above. At about 9 p.m., Randol saw defendant asleep in his automobile, on a country road, some three miles from Napa. He awakened defendant, and asked him, "Why aren't you out looking for your children?" Defendant indicated he was tired and trying to get some rest. At this point the officer left. At 12 midnight, that same evening, Randol returned to the same spot, awakened defendant, asked again about the girls, and told him that Mrs. Ray wanted to see him. Randol drove to Mrs. Ray's apartment and waited outside. At 2 or 3 a.m., Mrs. Ray left the apartment.

At about 8:30 a.m. the next morning, Tuesday, Randol saw defendant talking with the crossing guards at the school. Randol then instructed him to refrain from talking to the children, and let the police conduct the interviews. It was on this occasion that defendant made the tape recording narrating his trip along the Mendocino coast, a transcript of which, defendant now asserts, was improperly received in evidence.

On Tuesday night, Randol kept Mrs. Ray's apartment under surveillance. He tried knocking at the door of the apartment. When defendant did not answer, he contacted Mrs. Ray. Mrs. Ray visited the apartment and observed defendant. Then Randol sent a patrol officer into the apartment. The officer stayed for some 30 to 45 minutes, and left. Some 30 minutes later, Randol himself knocked on the apart-

ment door and awakened defendant. Randol was invited into the apartment, and he had a conversation with defendant about people who might know something concerning the girls' disappearance.

On Wednesday, defendant and Randol drove over the route that defendant had taken on Monday, October 4th. On Friday, October 8th, Randol had another conversation with defendant. Defendant indicated he had received some money, and would now be able to do some searching on his own. On this occasion, Randol directed defendant not to leave the area. That evening defendant left Napa on a drive that took him to Reno, Virginia City, Carson City, and back to Napa on the following evening.

On the next occasion of their meeting, after Renay's body was found, Randol arrested defendant.

During the period between October 4th and 10th, defendant had several conversations with his wife and others, that revealed his state of mind. At a midnight conversation, on October 4th, Mrs. Ray told defendant she would do anything he wanted, if he would return the girls. Defendant indicated he did not have the children, and she should start preparing for the worst. During this conversation defendant told his wife about his trip along the coast, and in response to her questions, he declared he did not want to be bothered about stopping to get his back pay in Petaluma. In other conversations during that period defendant told his wife: ''I want you to realize when they find them they will be dead.'' On October 9, 1965, defendant called his wife from Carson City, and indicated he did not want to be around when the girls were found.

On Saturday, October 9th, a friend of the Ray family, Hazel Crosson, had a conversation with the Rays while they were at the police station. Mrs. Crosson testified that the defendant said to her that he had been running from himself, that his conscience was bothering him. She also testified that later in the evening, at Mrs. Ray's apartment, when Mrs. Ray began crying, defendant told Mrs. Crosson to leave his wife alone, that she needed to be punished. She also testified that defendant said to his wife, ''Mom, if or when they find those girls they will not be in this county and they will be dead.''

Defendant testified on his own behalf. He denied he had threatened to kill his family. He maintained that his threats had always been directed against his mother-in-law and her son. He denied he had said the children would not be found in

Napa County. He indicated that any statements he did make were an attempt to get the police to search a broader area. Defendant narrated his trip along the coast. He did not see anyone at Bodega Bay, nor did he remember applying for a job at Cloverdale.

*Jury Selection*

Section 1074 of the Penal Code provides in part: "A challenge for implied bias may be taken for all or any of the following causes, and for no other: . . . 8. If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty; in which case he must neither be permitted nor compelled to serve as a juror."

Identical provisions have always been a part of the law of this state. (Stats. 1850, ch. 119, § 377, subd. 9th, p. 302 [cf. N.Y. Code Crim. Proc. (1958) § 377, subd. 8, as amended Laws 1963, ch. 997, § 7; and (1850) § 424, subd. 8 of Report of Commissioners on Practice and Pleading, Dec. 31, 1849]; Stats. 1851, ch. 29, § 347, subd. 9th, p. 250; Pen. Code (1872) § 1074, subd. 9; Code Amends. 1873-1874, ch. 614, § 57, subd. 8, p. 442; Code Annos. (1880) ch. 47, § 63, subd. 8, p. 20.)

Section 190 of the Penal Code provides in part: "Every person guilty of murder in the first degree shall suffer death, or confinement in the state prison for life, at the discretion of the court or jury trying the same. . . ." Originally this state had no degrees of murder and all murder was punishable by death. (Stats. 1850, ch. 99, § 21, p. 231.) Thereafter murder was divided into degrees and only murder of the first degree was punishable by death. (Stats. 1856, ch. 139, § 2, p. 219; Pen. Code (1872) § 190.) Shortly after the enactment of the present Penal Code the provisions were amended to provide the present alternative "at the discretion of the jury trying the same, or upon plea of guilty, the court shall determine the same; . . ." (Code Amends. 1873-1874, ch. 508, § 1, p. 457.) These provisions continued in effect until 1957. (Stats. 1921, ch. 105, § 1, p. 98; and Stats. 1927, ch. 889, § 1, p. 1952.)

Under these provisions it was proper to sustain a challenge on the ground of implied bias (Pen. Code, § 1074, subd. 8) to a juror who indicated that nothing, including the fact that the offense charged could be punishable with death, would prevent his finding the defendant guilty of murder in the first degree if the evidence warranted it, but who also stated that he did not believe in capital punishment and in no event would he vote for the death penalty. (*People* v. *Riser* (1956)

47 Cal.2d 566, 573-576 [305 P.2d 1] [disapproved on other grounds *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]].) The court concluded: ''The statute [Pen. Code, § 190] calls for the exercise of a legal discretion, not for the unswerving application of views formulated before trial that will compel a certain result no matter what the trial may reveal.

''Admittedly, a literal reading of section 1074, subdivision 8, does not compel the exclusion of jurors incapable of exercising the discretion contemplated by section 190. [Fn. omitted.] It would be doing violance to the purpose of these sections of the Penal Code, however, to construe section 1074, subdivision 8, to permit these jurors to serve. It would in all probability work a de facto abolition of capital punishment, a result which, whether or not desirable of itself, it is hardly appropriate for this court to achieve by construction of an ambiguous statute.'' (47 Cal.2d at pp. 575-576; and see *People* v. *Cheary* (1957) 48 Cal.2d 301, 311 [309 P.2d 431].)

In 1957 the language referring to the disposition ''upon plea of guilty'' was deleted and there was added, ''and the matter of punishment shall be determined as provided in Section 190.1 . . .'' (Stats. 1957, ch. 1968, § 1, p. 3509.) Section 190.1, added at the same time (*id.*, § 2), and subsequently amended in particulars not material to this case (Stats. 1959, ch. 738, § 1, p. 2727), provided and provides for a separate trial on the issue of penalty, and expressly states: ''If the defendant was convicted by a jury, the trier of fact . . . shall be the same jury unless, for good cause shown, the court discharges that jury in which case a new jury shall be drawn to determine the issue of penalty. . . .''

▇▇ At the trial, when the prosecutor first questioned a prospective juror on *voir dire* in order to determine whether she entertained any conscientious scruples against capital punishment, the defendant objected and moved the court for an order granting the defendant one jury for the trial of the question of guilt or innocence, and another for the trial of the question of penalty. ▇▇ He asserted that the questioning, and the resulting exclusion of such jurors as might entertain a conscientious objection to the death penalty, resulted in a denial of his right to a fair trial by an impartial jury and violated the due process and equal protection of the law guarantees of the state and federal Constitutions, because a jury from which all persons with scruples against capital punishment had been removed was more prone to convict than

would be a jury selected without regard to their opinions on punishment.[3]

In support of the motion, the defendant presented the testimony of two clinical psychologists who each opined that a jury composed of jurors who state they have no conscientious objection to the death penalty is more likely to find a defendant guilty on the guilt phase of the trial than a jury not so selected. Each acknowledged that his opinion was based on his general knowledge and experience, and that he had conducted no research with jurors on this specific problem.

The trial court denied the motion for separate trial by another jury without prejudice to defendant's renewing it at a later stage of the proceedings if good cause were shown. The trial court also overruled defendant's objection to the form of question used by the prosecutor, which does not follow the statutory language but reads: "If the proper penalty under the circumstances of this case were death, do you have a conscientious scruple or objection to voting for the death penalty?"

Ninety-eight prospective jurors were examined on *voir dire.* Of the first eighty-two, who were examined in connection with the selection of the first twelve jurors, thirteen acknowledged a conscientious objection to capital punishment. Of these, four prospective jurors acknowledged that this scruple would affect their judgment on the issue of guilt or innocence, and were excused—three on the court's own motion, and one after the prosecution's challenge. No complaint is made of these rulings. (See *People* v. *Mitchell* (1964) 61 Cal.2d 353, 365 [38 Cal.Rptr. 726, 392 P.2d 526].)

On the first day of the trial the court summarily excused four jurors, whom defendant asserts were properly qualified for passing on the guilt phase of his trial, when they acknowledged a conscientious objection to voting for the death penalty. Subsequently a fifth such juror was excused on the

[3]For a discussion of the thesis advanced by defendant see: *Pope* v. *United States* (8th Cir. 1967) 372 F.2d 710, 724-725; and cf. Oberer, *Does Disqualification of Jurors for Scruples Against Capital Punishment Constitute Denial of Fair Trial on Issue of Guilt?* 39 Tex.L.Rev. (1961) 545; Togman, *Two Trial System in Capital Cases* (1964) 39 N.Y.U. L.Rev. (1964) 50 at pp. 54-57; McClelland, *Conscientious Scruples Against the Death Penalty in Pennsylvania*, 30 Pa. Bar Assoc. Q. (1959) 252. The United States District Court for the Northern District of California has been requested to review this issue (along with others) in regard to convicted murderers awaiting execution. (Action No. 473, filed June 26, 1967.)

People's challenge, even though he expressly stated his feeling would not affect his judgment on the guilt phase of the trial. The subject had not been so directly explored with the preceding four jurors.

Commencing with the second day of trial, the court manifested an intention to permit those prospective jurors who were opposed to capital punishment, but who stated their beliefs would not affect their judgment on the guilt phase of the trial, to be seated for that phase of the trial. The remaining four conscientious objectors to the death penalty were so seated, three despite the challenge of the prosecutor, who subsequently excused all four by the exercise of peremptory challenges. The trial court's pertinacity in applying a theory of qualification for the guilt phase alone was further evidenced by its overruling of the defendant's challenge to a juror who manifested a preference for the death penalty over life imprisonment. The prosecutor, apparently to avoid error (see *People* v. *Hughes* (1961) 57 Cal.2d 89, 94-95 [17 Cal.Rptr. 617, 367 P.2d 33]), excused this prospective juror, and another of similar bias to whom no challenge had been interposed, by the use of peremptory challenges. ▮ The court apparently intended to provide for sufficient alternative jurors, who would not be disqualified, to serve on the penalty phase if necessary, in place of those whom it deemed qualified for the guilt, but not penalty phase of the trial. ▮ This eventuality did not come to pass because of the manner in which peremptory challenges were exercised. None of the first twelve jurors sworn to try the case, nor the two alternates had any conscientious objection to the death penalty, or any preference for it over life imprisonment.

When the defendant had exhausted his peremptory challenges the court granted his first request for an additional challenge, but denied his application for a second and further additional peremptory challenges.

Of the sixteen jurors examined to secure two alternate jurors, three acknowledged they had such conscientious objections to the death penalty as would affect their ability to return a verdict of first degree murder. They were summarily excused. A fourth juror who stated that such scruples would not preclude her from acting fairly at the guilt phase of the trial was seated, but was later excused by the exercise of a peremptory challenge by the People.

▮ Defendant now asserts that the court properly limited the challenge granted by subdivision 8 of section 1074 to

those jurors who acknowledged that their conscientious opinion would affect their judgment on the issue of guilt as well as on the penalty phase of the case. He contends that this is the only proper interpretation of the statute in view of the change in procedure initiated with the adoption of section 190.1; and that if it is not so construed it violates his right to a trial by an impartial jury and the constitutional guarantees of due process of law and equal protection of the law, because the remaining jurors are guilt-prone.

 Defendant alleges that the court erroneously excused the five jurors who, while acknowledging a conscientious scruple against the death penalty, did not acknowledge that this belief would affect their judgment on the issue of guilt or innocence. He claims prejudice and relies upon *People* v. *Stewart* (1857) 7 Cal. 140, wherein the court said: "It is contended that the prisoner has not been injured by the allowance of the challenge, and that it is the duty of this Court to affirm the judgment, unless it clearly appears that error has intervened. In other words, that the prisoner having been fairly tried by a competent jury, we are not at liberty to say that the result would have been different if the Court had not excluded the particular juror excepted to. What the result might have been under such circumstances, we are of course unable to say, but the human mind is so constituted, that facts and circumstances do not always produce the same results; the judgment of two men upon the same state of facts may be diametrically opposite, particularly in the determination of a criminal case, when every doubt is carefully weighed and scrupulously balanced.

"It is enough for us to know, that the result might have been different; that the prisoner was entitled to be tried by a panel summoned in a particular way, and that the Court erred in deciding that one of the jurors was incompetent." (7 Cal. at p. 144; and see also *People* v. *Schmitz* (1908) 7 Cal.App. 330, 346-351 [94 P. 407, 419, 15 L.R.A. N.S. 717].)

*Schmitz* deals with the time at which a peremptory challenge may be exercised, and the showing necessary to establish good cause to permit challenging a juror after he is sworn, but before the jury is complete (see Pen. Code, § 1068). The *Stewart* case was criticized in *People* v. *Murphy* (1872) 45 Cal. 137, wherein the court pointed out that no exception may be taken to the decision of a trial court allowing a challenge for implied bias (see Pen. Code, former § 1170). The necessity for exceptions was abolished in 1909 (Stats. 1909, ch. 709, § 1,

p. 1083). At the same time, however, review was limited to questions of law "which affected the substantial rights of the defendant." (Pen. Code, § 1259, as amended Stats. 1909, ch. 713, § 1, p. 1088.) The reasoning in *Murphy* renders it questionable whether a defendant can show prejudice because a particular person was erroneously excluded from the jury. The court said: "The reason, and it is a sensible one, upon which the statute proceeds [omitting an exception for allowing a challenge], is that when a competent jury, composed of the requisite number of persons, has been impaneled and sworn in the case, the purpose of the law in that respect has been accomplished; that, though in the impaneling of the jury one competent person be rejected, yet if another competent person has been substituted in his stead, no injury has been done to the prisoner, certainly no injury which a new trial would repair, because even should a venire *de novo* be awarded, it is not pretended that the prisoner could insist upon the excluded person being specially returned upon the panel. The result would be that the prisoner would probably be tried again by another competent jury, of which the excluded person would not be a member, and so the new trial would only be to do over again that which had been done already." (45 Cal. at p. 143; and see *People* v. *Amaya* (1901) 134 Cal. 531, 535 [66 P. 794]; *People* v. *Durrant* (1897) 116 Cal. 179, 199 [48 P. 75]; *People* v. *Atherton* (1876) 51 Cal. 495, 495-496; *People* v. *Colson* (1875) 49 Cal. 679, 679-680; *People* v. *Arceo* (1867) 32 Cal. 40, 44-45 and 48; *People* v. *Moore* (1923) 64 Cal.App. 328, 329-330 [221 P. 665].) The true gravamen of defendant's complaint must rest upon his contention that the action of the court left him faced with a jury that was improperly constituted because all the members thereof were guilt-prone, or because there had been a systematic exclusion of those who were not guilt-prone. (Cf. *People* v. *Adamson* (1949) 34 Cal.2d 320, 327 [210 P.2d 13].)

Procedurally defendant is faced with a long line of decisions which have applied the amplification of the scope of section 1074, subdivision 8, as approved and recognized in *Riser,* as against the argument that the statutory revisions of 1957 compelled a different result. (*People* v. *Nicolaus* (1967) 65 Cal.2d 866, 881-882 [56 Cal.Rptr. 635, 423 P.2d 787]; *People* v. *Thomas* (1967) 65 Cal.2d 698, 705 [56 Cal.Rptr. 305, 423 P.2d 233]; *People* v. *Smith* (1966) 63 Cal.2d 779, 789 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Gilbert* (1965) 63 Cal.2d 690, 711-712 [47 Cal.Rptr. 909, 408 P.2d 365]; *People*

v. *Whitmore* (1967) .251 Cal.App.2d 359, 364 [59 Cal.Rptr. 411] ;. *People* v. *Miller* .(1966) 245 Cal.App.2d 112, 137-139 [53 Cal.Rptr. 720] ; and *People* v. *King* (1966) 240 Cal.App. 2d 389, 396-398 .[49.Cal.Rptr. 562].)

, In 'People* v. *Carter* (1961) 56 Cal.2d 549 [15 Cal.Rptr. 645, 364 P.2d 477], it was recognized as was admittedly the case here with four of those examined as regular jurors, and three of the prospective alternates, that " [O]n the trial of the issue of guilt the possibility of ultimate selection of the death penalty might affect the deliberations of a juror who was opposed to capital punishment but who would have had no other conscientious objections to finding defendant guilty of first degree murder. . . .'' (56 Cal.2d at p. 573, fn. 10.)

*Nicolaus,, Thomas, Gilbert* and *Miller, supra,* all have considered . defendant's ,charges , of unfairness and violation of constitutional rights. In *Nicolaus,* the court concluded: ''Defendant contends, however, that these cases should be overruled, .complaining, in effect, that a death-qualified jury does npt constitute a jury of one's peers; that it cannot answer guilty-innocence questions as favorably to the defendant; that it cannot be impartial on the nature of punishment in the event of conviction; that it does not take into the jury room a pattern of attitudes characteristic of the community at large; that such a jury is authoritarian in nature and not disposed to humanitarianism. Such contentions are untenable, not only for the reasons stated in the foregoing cases, but specifically, were even one juror.committed to a policy opposed to imposition of the death penalty in a proper case the rendition of justice in murder cases, as presently defined in our statutes on the subject, could be nullified. Any fundamental change in such law falls within the legislative domain.''

▆▆▆ ·Defendant seeks to escape these precedents because this is the first instance· in which reference can be made to expert testimony supporting the guilt-prone theory on which his argument is predicated. The opinion testimony can rise no higher than the reasons upon which it is predicated and the trier of fact is not bound to accept it as conclusive. (See Pen. Code, § 1127b.) Although the psychologists' theories may be appealing, they cannot upset the established statutory and case law of this state. Their appeal may more properly be addressed to the Legislature.

▆▆▆ The rationality of the implied bias created by subdivision 8 of section 1074 is demonstrated by the mental attitude of seven of the sixteen conscientious objectors. Any of

the persons mentioned in the other subdivisions of the section might well disclaim any bias under oath, but such fact would not give a defendant grounds to object were such person excluded on the challenge of the prosecution. Defendant asserts that since there is no constitutional right to have a jury fix the punishment (see *People* v. *Fuller* (1964) 226 Cal.App.2d 331, 333 [38 Cal.Rptr. 25]), any consideration aimed at securing impartiality at that stage of the proceedings should yield to the necessity of impartiality, allegedly destroyed by the exclusion of a class, at the prior guilt phase. This argument, however, overlooks the rationale of *Riser* and the cases following it, that the exclusion is warranted because the state of mind evidenced by conscientious objection to the death penalty does in fact pervade the trial on the issue of guilt whenever that penalty may be imposed. So long as it is known that the offense may be so punished, this influence may be felt, even though another jury or the court were to determine the actual sentence.

No error prejudicial to defendant is found in the procedure under which the jury was selected. ■ The proposed practice of permitting jurors, disqualified under existing law from sitting on the penalty phase of the case, to sit on the guilt phase of the case, with replacement by available qualified alternates if a penalty trial is necessary, is disapproved. ■ No opinion is expressed on the propriety of exercising discretion to have separate juries where good cause is shown to discharge the jury which convicts the defendant. (Pen. Code, § 190.1.) No abuse of discretion is found in the denial of defendant's anticipatory motion to do so in this case.

### *Evidence—Photographs*

A photograph of the clothed body of the deceased child at the mortuary was identified by one of the officers who had brought it there from the beach where it was found, by the photographer who took the picture, and by an investigating officer who testified concerning the decedent's clothing. The photographer also identified three other photographs of portions of the clothed body, and five photographs taken from various angles of portions of the body after the clothing had been removed.

When the prosecutor requested that the photographs be marked for identification the defendant announced that he had an objection to some, if not all, of the pictures. Subse-

954

quently, prior to calling the pathologist who performed the autopsy, the prosecutor suggested that the court consider the defendant's objections out of the presence of the jury. Defendant thereupon objected to the nine photographs on the grounds that each of them was inflammatory and gruesome in nature and would tend to inflame the feelings of the jury unnecessarily, and that collectively they were repetitious.

In the course of argument on the objection, the prosecution urged that the photographs were probative as evidence of the condition of the body at the time it was found, as evidence of the length of time it had lain on the beach, as evidence of identity, and as evidence of injuries suffered prior to death.

The court after listening to argument concluded: "I think I will have to rule on each one as they are presented in the case. . . . You won't need to argue your objection. You may make it for the purpose of the record as each is offered and I will rule on it depending on the circumstances at that time." The attorney for the defendant registered his assent.

Thereafter, the doctor who conducted the surgical autopsy and the pathological examination used all but one of the photographs in question to illustrate her testimony concerning the condition of the body as she first observed it, and concerning approximately ten different areas of the body where she found bruises incurred before death. At the conclusion of the doctor's testimony the prosecutor offered those eight photographs into evidence. (The remaining photograph, ostensibly repetitious, was never offered or received in evidence.) The defendant voiced no objection. The court ordered them admitted, and they were forthwith exhibited to the jury without protest by defendant.

The defendant having failed to request a ruling on his previous objection in the manner suggested by the court, and there having been no motion to strike the allegedly inadmissible evidence, the error, if any, is deemed waived. (*People* v. *Brown* (1965) 238 Cal.App.2d 924, 929 [48 Cal.Rptr. 204]; *People* v. *Valdez* (1961) 188 Cal.App.2d 750, 757-758 [10 Cal. Rptr. 664]; *People* v. *Slaver* (1953) 115 Cal.App.2d 711, 724 [252 P.2d 700]; *People* v. *Pratt* (1947) 77 Cal.App.2d 571, 578 [175 P.2d 888]; and see *In re Lessard* (1965) 62 Cal.2d 497, 503 [42 Cal.Rptr. 583, 399 P.2d 39]; and Witkin, Cal. Evidence (1966) §§ 1285 and 1302, pp. 1188 and 1205.)

Defendant insists that the court was applying an erroneous test to judge the admissibility of the photographs. It may be contended therefrom that further objection would

have been futile and that defendant is entitled to a review of the questions not directly raised. (Cf. *People* v. *Ranney* (1931) 213 Cal. 70, 74 [1 P.2d 423].) In the course of the preliminary argument on the defendant's proposed objection, the trial court did observe, "I think the rule is well settled that if they have evidentiary value and are not merely introduced for the purpose of inflaming a jury, it is proper to show them. . . . It seems to me if they have any evidentiary value, unless they are repetitious, that they should be admitted into evidence if properly identified." In *People* v. *Ford* (1964) 60 Cal.2d 772 [36 Cal.Rptr. 620, 388 P.2d 892], the court stated, "the trial court prima facie abused its discretion as a matter of law in failing to *weigh* the probative value of the photographs in resolving a material issue as against the danger of prejudice to the defendant through needless arousal of the passions of the jurors. [Citations.]" (60 Cal.2d at p. 801; accord: *People* v. *Davis* (1965) 62 Cal.2d 791, 797-798 [44 Cal.Rptr. 454, 402 P.2d 142].) In the *Ford* case the trial court had indicated that the evidence " '. . . might tend to be prejudicial' but nevertheless ruled that 'as long as it is material and shows the deceased after the incident, *it is material and will go in on that basis*'; . . ." (*Id.*)

It is difficult to speculate on what grounds the court might have overruled an objection, if one had been properly interposed when the photographs were actually offered. In *Ford* the case was being reversed on other grounds. The mere fact that the trial court failed to apply the proper criteria would not be error if it would have been an abuse of discretion to exclude the photographs. ■ A correct decision will not be reversed because it is based on erroneous grounds. (*Davey* v. *Southern Pac. Co.* (1897) 116 Cal. 325, 329-330 [48 P. 117]; and see *Zak* v. *State Farm etc. Ins. Co.* (1965) 232 Cal.App. 2d 500, 506 [42 Cal.Rptr. 908].) If the admission of the evidence does not constitute an abuse of discretion, then the failure of the trial court to apply the proper criteria, should not be reversible error unless it has resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13 [formerly § 4½]; *People* v. *Chavez* (1958) 50 Cal.2d 778, 792 [329 P.2d 907]; *People* v. *Cavanaugh* (1955) 44 Cal.2d 252, 268-269 [282 P.2d 53].)

■ The photographs may be said to be illustrative of the pathologist's testimony in which she stated, "The decomposition exteriorly was more generally than that internally. There was skin slip over a major share of the body. The face was misshapened. The scalp was loosened with sand silted

under in places. The body was quite malodorous and somewhat swollen.'' They are unquestionably gruesome. They inspire a sense of pity. The gruesomeness, however, is unmistakably caused by natural exposure, and lacks the inflammatory character of wounds or injuries unquestionably caused by the direct intervention of a human agency.

Defendant contends that if the probative value had been weighed against the possible prejudice, the evidence should have been rejected as a matter of law. In *People* v. *Burns* (1952) 109 Cal.App.2d 524 [241 P.2d 308, 242 P.2d 9], this court found an abuse of discretion in the admission of pictures of the victim's face, neck and torso after an autopsy, the performance of which left the body grotesque and horrible. Although offered to show the bruises and abrasions on the body of the victim, the court observed: ''In view of the fact that no question was raised as to these bruises and abrasions, and the fact that a view of them was of no particular value to the jury, it is obvious that the only purpose of exhibiting them was to inflame the jury's emotions against defendant.'' (109 Cal.App.2d at p. 541.) The court concluded: ''The admission of photographs of this type is within the sound discretion of the trial court. Surely, there is a line between admitting a photograph which is of some help to the jury in solving the facts of the case and one which is of no value other than to inflame the minds of the jurors. That line was crossed in this case.'' (*Id.* at p. 542; see also *People* v. *Chavez, supra,* 50 Cal.2d 778, 792; *People* v. *Cavanaugh, supra,* 44 Cal.2d 252, 266-268; and *People* v. *Redston* (1956) 139 Cal.App.2d 485, 490-491 [293 P.2d 880].)

*Burns* generally has been distinguished because the relevant injuries depicted were admitted and because the horrible nature of the pictures consisted of the depiction of the mutilation of the body caused by the autopsy itself. (See *People* v. *Darling* (1962) 58 Cal.2d 15, 21 [22 Cal.Rptr. 484, 372 P.2d 316]; *People* v. *Brommel* (1961) 56 Cal.2d 629, 636 [15 Cal. Rptr. 909, 364 P.2d 845]; *People* v. *Love* (1960) 53 Cal.2d 843, 852 [3 Cal.Rptr. 665, 350 P.2d 705]; *People* v. *Atchley* (1959) 53 Cal.2d 160, 168 [346 P.2d 764]; *People* v. *Cheary, supra,* 48 Cal.2d 301, 312; *People* v. *Reese* (1956) 47 Cal.2d 112, 119-120 [301 P.2d 582] [disapproved on other grounds *People* v. *Morse* (1964) 60 Cal.2d 631, 649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]].)

 ''Relevant evidence of the condition of deceased's body is admissible although it may be gruesome and possibly inflam-

matory. [Citations.] And cumulative evidence on the subject may be proper [citations]." (*People* v. *Reese, supra,* 47 Cal.2d 112, 120; and see *People* v. *Sanchez* (1967) 65 Cal.2d 814, 828 [56 Cal.Rptr. 648, 423 P.2d 800]; *People* v. *Arguello* (1967) 65 Cal.2d 768, 775-776 [56 Cal.Rptr. 274, 423 P.2d 202]; *People* v. *Conley* (1966) 64 Cal.2d 310, 326 [49 Cal. Rptr. 815, 411 P.2d 911]; *People* v. *Mathis* (1965) 63 Cal.2d 416, 423 [46 Cal.Rptr. 785, 406 P.2d 65]; *People* v. *Modesto* (1963) 59 Cal.2d 722, 733-734 [31 Cal.Rptr. 225, 382 P.2d 33] [disapproved on other grounds *People* v. *Morse* (1964) 60 Cal.2d 631, 649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]]; *People* v. *Harrison* (1963) 59 Cal.2d 622, 627-628 [30 Cal.Rptr. 841, 381 P.2d 665]; *People* v. *Darling, supra,* 58 Cal.2d 15, 21; *People* v. *Brommel, supra,* 56 Cal.2d 629, 935-939; *People* v. *Kemp* (1961) 55 Cal.2d 458, 477-478 [11 Cal. Rptr. 361, 359 P.2d 913]; *People* v. *Love, supra,* 53 Cal.2d 843, 852-853; *People* v. *Atchley, supra,* 53 Cal.2d 160, 168; *People* v. *Chavez, supra,* 50 Cal.2d 778, 792; *People* v. *Cheary, supra,* 48 Cal.2d 301, 311-312.)

An examination of the foregoing cases clearly indicates that it would have been no abuse of discretion to admit the photographs if objection had been properly made and had been properly evaluated. On this state of the record, and in the light of the entire record, no reversible error has been shown.

*Evidence—Statements*

According to the testimony of the investigating detective of the Napa Police Department, when he first saw the defendant, following the latter's return to Napa on the afternoon of the day the girls disappeared, he told him "that if his girls were missing and if foul play was subsequently found to be involved, . . . he, the defendant, would be the prime suspect in this case. . . . That under the laws of the constitution he had every right to remain silent. That he need not make any statement to me. That any statement that he might make might subsequently be used against him. And that he was entitled to the services of an attorney at all times."

Later that afternoon at the police station, to which, from all that appears, the defendant had gone of his own volition, the defendant first told of his trip from Napa out and along the coast and back again. The following morning the detective found the defendant interrogating the junior traffic patrol officers at the school. After telling the defendant

not to interfere with the investigation he asked him to demonstrate how he left the children off at the school. Thereafter he requested defendant to make a tape-recorded statement of his activities, and advised him "that he had the right to remain silent and that he also had the right to engage an attorney at any time during the proceedings."

Defendant thereupon gave a statement in which, among other things, he admitted that he drove past the beach where his daughter's body was later found, he equivocated, as he did in the prior statement and later in his testimony, about seeking employment, and he disclosed that he not only phoned from Cloverdale to request that someone else pick up the girls, but also went to the school himself to seek them on his return to Napa.

At the trial, testimony of the Monday evening conversation was received without objection. Before a transcript of the tape-recorded statement was received in evidence, the witness was subjected to *voir dire* examination by the defendant's counsel. He brought out that the defendant knew his statement was being recorded, that the detective "advised him of his rights to remain silent and talk to an attorney," and that no tape recording was made of that portion of the conversation. No attempt was made to controvert the detective's testimony, then or later.

The transcript of the tape recording was received in evidence and read to the jury without objection from defendant.

Since the case was tried before June 13, 1966, the date of the decision in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] it is governed by *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758] and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], and not by *Miranda*. (*People* v. *Rollins* (1967) 65 Cal.2d 681, 691-692 [56 Cal.Rptr. 293, 423 P.2d 221].)

In the absence of objection, the question of the admissibility of testimony reciting defendant's statements cannot be raised for the first time on appeal. (*People* v. *Warrick* (1967) 249 Cal.App.2d 1, 3 [57 Cal.Rptr. 121], and cases cited; see also *People* v. *Larke* (1966) 246 Cal.App.2d 571, 574-575 [54 Cal.Rptr. 834]; *People* v. *Hansard* (1966) 245 Cal.App. 2d 691, 697 [53 Cal.Rptr. 918]; *People* v. *Valdez* (1966) 239 Cal.App.2d 459, 464-466 [48 Cal.Rptr. 840].)

It is questionable whether the interrogation falls within the

type proscribed by the *Escobedo-Dorado* doctrine. At the time it was not known whether or not an offense had been committed, and the defendant was not in custody, in fact he subsequently left the area. (Cf. *People* v. *Wilson* (1967) 66 Cal.2d 749, 765 [59 Cal.Rptr. 156, 427 P.2d 820]; *People* v. *Modesto* (1967) 66 Cal.2d 695, 706 [59 Cal.Rptr. 124, 427 P.2d 788]; and the same case (1965) 62 Cal.2d 436, 466 [42 Cal.Rptr. 417, 398 P.2d 753]; *People* v. *Hines* (1967) 66 Cal.2d 348, 352-354 [57 Cal.Rptr. 757, 425 P.2d 557]; *People* v. *Warrick, supra,* 249 Cal.App.2d 1, 4; *People* v. *Woods* (1966) 239 Cal. App.2d 697, 704 [49 Cal.Rptr. 266]; and *People* v. *Martinez* (1966) 239 Cal.App.2d 161, 172 [48 Cal.Rptr. 521]; with *People* v. *Arnold* (1967) 66 Cal.2d 438, 443-451 [58 Cal.Rptr. 115, 426 P.2d 515]; *People* v. *Kelley* (1967) 66 Cal.2d 232, 245-246 [57 Cal.Rptr. 363, 424 P.2d 947]; and *People* v. *Furnish* (1965) 63 Cal.2d 511, 515-517 [47 Cal.Rptr. 387, 407 P.2d 299].)

In any event, it is clear that defendant was advised of his rights. Prior to the discovery of the body, he was anxious to establish that he was out of the area following the time he allegedly left the girls off at school. Having been advised and having waived his rights he cannot now complain. (See *People* v. *Wilson, supra,* 66 Cal.2d 749, 765; *People* v. *Eli* (1967) 66 Cal.2d 63, 72-76 [56 Cal.Rptr. 916, 424 P.2d 356]; *People* v. *Thomas, supra,* 65 Cal.2d 698, 703-704; *People* v. *La Vergne* (1966) 64 Cal.2d 265, 270 [49 Cal.Rptr. 557, 411 P.2d 309]; *People* v. *Luker* (1965) 63 Cal.2d 464, 473 [47 Cal.Rptr. 209, 407 P.2d 9]; *People* v. *Warrick, supra,* 249 Cal.App.2d 1, 3; *People* v. *Hansard, supra,* 245 Cal.App.2d 691, 697; *People* v. *Culp* (1966) 241 Cal.App.2d 352, 356-357 [50 Cal.Rptr. 471]; and *People* v. *Palmer* (1965) 236 Cal.App.2d 645, 649-650 [46 Cal.Rptr. 449].)

No error is found in the admission of evidence of the statements the defendant gave to the police during the investigation.

*Denial of Mistrial*

The defendant's wife, the mother of the victim, was called as a witness for the prosecution. After testifying to some matters of family history, she was asked if the defendant ever threatened to kill the children. She testified that he first made such a threat in 1959, and in response to the question, "And what was said on that occasion?" volunteered, "I had him arrested for molesting my daughter, the oldest one."

The defendant promptly voiced an objection, and, out of the presence of the jury requested the court to instruct the jury to disregard the remark if possible, and moved the court for a mistrial.[4]

The court denied the motion for a mistrial. It ordered the answer stricken, and instructed the jurors then, and again at the conclusion of the guilt phase of the case, that it was their duty as jurors to disregard the stricken evidence, and treat it as though they had never heard it. The prosecution disclaimed an intent to prove other offenses, and only offered evidence of the threats to show motive. The court thereafter limited the witness to testifying as to what the defendant had said, to the exclusion of the balance of the conversations resulting in the threats.

The eldest daughter, Audrey, was however soon mentioned again in the mother's testimony. She was named as the child designated in a threat in January 1965, following the separation of defendant and the witness, "that he would blow [the witness'] daughter's head off. . . ." It was brought out that Audrey left the family home for a foster home early in 1965, and remained out of the family when the Rays reunited in June and moved to Cloverdale where they remained until August, and while the Rays went to Salt Lake and returned to San Pablo, where another separation occurred in the latter part of that month. That separation resulted after a roadside meeting between the Rays, and Mrs. Ray's mother, her brother and Audrey, who were in another car. An argument developed as to whether Mrs. Ray should see Audrey, and culminated in Mrs. Ray and the children leaving with her mother and the others. Audrey went with her mother to Tuolumne, but, on returning to Napa in a few days, renewed her residence in the foster home.

Subsequently, the prosecution brought out that the conversation in 1959 which resulted in defendant's threat "that he would see [Mrs. Ray] and the children both all six foot under," included a discussion of the defendant's conduct with Audrey. Defendant's objection to this testimony was overruled. The witness further testified that the same subject was discussed at the time defendant made the threats early in 1965. It was further brought out that the night before the

---

[4] At the penalty phase of the trial the eldest daughter Audrey testified she had been molested by her father, that charges were filed, that there was a trial, and that he was acquitted.

girls disappeared defendant offered to care for all the family, except Audrey, if his wife would have him back.

Defendant urges that there has been an erroneous mention of another offense which the court's admonition could not erase, and which is prejudicial because of the diaphanous nature of the circumstantial evidence in which the prosecution ultimately enmeshed him.

"The general rule is that evidence of other crimes is inadmissible when it is offered solely to prove criminal disposition or propensity on the part of the accused to commit the crime charged, because the probative value of such evidence is outweighed by its prejudicial effect. [Citations.]" (*People* v. *Kelley, supra,* 66 Cal.2d 232, 238; and see *People* v. *Braun* (1939) 14 Cal.2d 1, 6-7 [92 P.2d 402]; *People* v. *Chambers* (1964) 231 Cal.App.2d 23, 30 [41 Cal.Rptr. 551]; *People* v. *Bentley* (1955) 131 Cal.App.2d 687, 691 [281 P.2d 1] [dismissed on other grounds]; *People* v. *White* (1958) 50 Cal.2d 428, 431 [325 P.2d 985]]; *People* v. *Baylor* (1941) 47 Cal.App. 2d 34, 38-39 [117 P.2d 425]; and *People* v. *Hudson* (1927) 86 Cal.App. 497, 503 [260 P. 887].)

Where such evidence has been erroneously elicited it has been said: "The mere direction that the testimony should be disregarded was no antidote for the poison that had been injected into the minds of the jurors." (*People* v. *Bentley, supra,* 131 Cal.App.2d 687, 690; and see *People* v. *Braun, supra,* 14 Cal.2d 1, 7-8.) The complete rule is stated in *People* v. *Duncan* (1960) 53 Cal.2d 803 [3 Cal.Rptr. 351, 350 P.2d 103], as follows: "Defendant contends that these questions tended to degrade and debase her and that the error was not cured by the admonition of the court. Although it is not always possible to cure error in this manner, for example, where the objectionable evidence goes to the main issue and the proof of guilt is not clear and convincing, the jury, under ordinary circumstances, is presumed to obey the court's instructions and disregard the evidence. (*People* v. *Hardy,* 33 Cal.2d 52, 61-62 [198 P.2d 865].) Even if we accept defendant's contentions that the evidence objected to was inadmissible, it is clear that it did not go to the main issue in the case, and we must assume that the jury obeyed the court's instructions to disregard it." (53 Cal.2d at p. 818; and see *People* v. *Mathis, supra,* 63 Cal.2d 416, 424-425; *People* v. *Lambright* (1964) 61 Cal.2d 482, 486 [39 Cal.Rptr. 209, 393 P.2d 409]; *People* v. *Seiterle* (1963) 59 Cal.2d 703, 710 [31 Cal.Rptr. 67,

381 P.2d 947]; *People* v. *Prather* (1901) 134 Cal. 436, 439 [66 P. 589, 863]; *People* v. *Curtis* (1965) 232 Cal.App.2d 859, 867-868 [43 Cal.Rptr. 286]; and *People* v. *Zabala* (1963) 217 Cal.App.2d 550, 555-556 [31 Cal.Rptr. 712].)

 The prosecution was entitled to introduce direct evidence of prior quarrels and threats as bearing on defendant's motive, intent and premediation and deliberation. (See *People* v. *Cartier* (1960) 54 Cal.2d 300, 311 [5 Cal.Rptr. 573, 353 P.2d 53]; *People* v. *Granados* (1957) 49 Cal.2d 490, 494-495 [319 P.2d 346]; *People* v. *Dement* (1957) 48 Cal.2d 600, 604 [311 P.2d 505]; and cf. *People* v. *Lambright, supra,* 61 Cal.2d 482, 486.) Defendant now asserts that his threats "are as consistent with affection for his family and a desire not to be separated from them, as they are with a vengeful attitude." (Cf. *People* v. *Dement, supra,* 48 Cal.2d at p. 602.) The jury heard both him and his wife and could properly evaluate the testimony as to his prior statements. It is unnecessary to determine whether the court might properly have been more liberal in permitting exploration of the cause and nature of the quarrels which gave rise to the threats. (Cf. *People* v. *Spinelli* (1939) 14 Cal.2d 137, 143 [92 P.2d 1017].)

 There was no further mention of molestation in this trial after the matter was stricken. It was not claimed that the victim had been molested by the defendant. In fact the defendant unsuccessfully argued, in spite of the lack of physical evidence of a sexual attack, that the victim had been abducted and killed by a sex fiend.

The question and the volunteered reply left it undetermined as to whether the prosecutor should infer that defendant was justifiably angry at his wife for an unfounded charge, or whether his conduct was such as to warrant his wife's charge.

It further appears that this was an isolated instance of improper defamation of the defendant's general character, that it was not brought about by the prosecutor's misconduct, that it did not go directly to the main issue of the case, and that it was promply stricken with a proper admonition to the jury.

 The following rules govern this case: "A motion for a mistrial is addressed to the sound discretion of the trial court. It may properly be refused where the court is satisfied that no injustice has resulted or will result from the occurrences of which complaint is made. (23 C.J.S. Criminal Law,

court in denying the motion.'' (*People* v. *Grant* (1942) 53 Cal.App.2d 286, 288 [127 P.2d 567]; accord: *People* v. *Scott* (1960) 53 Cal.2d 558, 562 [2 Cal.Rptr. 274, 348 P.2d 882] [disapproved on other grounds *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]]; and *People* v. *Curtis, supra,* 232 Cal.App.2d 859, 867.)

*Instructions Given*

At the conclusion of the taking of testimony on the guilt phase of the case, the court and counsel, with the defendant present, considered the instructions proposed by the parties. (See Pen. Code, § 1093.5.) The parties both offered, and with an exception, hereinafter noted agreed to the general instructions. In regard to the substantive offense both parties offered, or assented to, and the court gave, instructions in the forms set forth as CALJIC 301, 302, 302-A (portion given), 303, 305-A, 305-B (rev.) and 312 (portion given) as found in California Jury Instructions, Criminal, revised edition 1958, as supplemented to January 1966. Instructions which referred to manslaughter (CALJIC 305 and 305-AA (new)) were rejected by the court.

Insofar as defendant requested, or joined in requesting the court to give an instruction, he is in no position to question or complain of its content. (*People* v. *Curtis* (1939) 36 Cal.App. 2d 306, 321 [98 P.2d 228]; and see *People* v. *Long* (1940) 15 Cal.2d 590, 605-606 [103 P.2d 969]; *People* v. *Curry* (1961) 192 Cal.App.2d 664, 675 [13 Cal.Rpr. 596]; and Witkin, Cal. Criminal Procedure (1963) § 491, subd. d, p. 497, and § 745, p. 719; but cf. *People* v. *Keelin* (1955) 136 Cal.App.2d 860, 873-875 [289 P.2d 520, 56 A.L.R.2d 355]; and Witkin, *op.cit.,* § 746, pp. 719-720.) Nevertheless, on appeal he endeavors to do so. ''It is not every case in which invited error will free the trial from the challenge that such error caused or contributed to a miscarriage of justice.'' (*People* v. *Keelin, supra,* 136 Cal.App.2d at pp. 874-875.) His present contentions must therefore be examined to determine whether they present any matter of subtance.

 (1) CALJIC 301[5] is criticized for its use of the

[5]''Murder is the unlawful killing of a human being with malice aforethought.

''Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.

''Malice aforethought, either express or implied, is manifested by the

phrase "abandoned and malignant heart." (Pen. Code, § 188; and see *People* v. *Phillips* (1966) 64 Cal.2d 574, 586-588 [51 Cal.Rptr. 225, 414 P.2d 353]; and comment reported in *People* v. *Montgomery* (1965) 235 Cal.App.2d 582, 587 [45 Cal.Rptr. 475]. Cf. CALJIC 300 (new) and 301 (rev.) as found in 1967 Cumulative Pocket Part.) Whatever shortcomings the phrase may have the court noted in *Phillips*," [W]e do not hold that the inclusion of a reference in an instruction to an 'abandoned and malignant heart' constitutes error. . . ." (64 Cal.2d at p. 588.)

No merit is found in the contention that the same instruction misled the jury because it refers to an "unlawful and felonious act" without defining such act. (Cf. *People* v. *Failla* (1966) 64 Cal.2d 560, 563-565 [51 Cal.Rptr. 103, 414 P.2d 39]; and *People* v. *Hudgins* (1965) 236 Cal.App.2d 578, 586 [46 Cal.Rptr. 199].) The third paragraph of this instruction may be redundant under the facts of this case, where the prosecution relied upon the prior threats voiced by the defendant, and the fact that the death resulted from asphyxiation due to smothering to establish a deliberate intention to unlawfully take away the life of the child. Any shortcoming in the instruction is not of such nature as to relieve defendant of the handicap of the invited error rule, or of the duty to request the court to qualify or omit part of what would otherwise be a valid instruction. (See *People* v. *Adams* (1967) 249 Cal.App.2d 501, 507 [57 Cal.Rptr. 389]; *People* v. *Lopez* (1963) 213 Cal.App.2d 668, 674 [28 Cal.Rptr. 912]; *People* v. *Robinson* (1960) 180 Cal.App.2d 745, 752 [4 Cal. Rptr. 679].)

(2) Defendant's objections to CALJIC 303 in its old form (cf. CALJIC 303 (rev.), 303-A (new) and 305.1 (new) as found in 1967 Cumulative Pocket Part) is predicated upon an alleged conflict with the doctrine of diminished capacity to deliberate and premeditate as developed in *People* v. *Wolff* (1964) 61 Cal.2d 795 (pp. 818-823 [40 Cal.Rptr. 271, 394 P.2d 959]) and applied in *People* v. *Ford,* 65 Cal.2d 41 (pp. 50-55 [52 Cal.Rptr. 228, 416 P.2d 132]). (See also *People* v. *Goedecke* (1967) 65 Cal.2d 850, 854-857 [56 Cal.Rptr. 625, 423 P.2d 777]; *People* v. *Nicolaus, supra,* 65 Cal.2d 866, 875-878; and *People* v. *Conley, supra,* 64 Cal.2d 310, 316-320.)

---

doing of an unlawful and felonious act intentionally, deliberately, and without legal cause or excuse. It does not imply a pre-existing hatred or enmity toward the individual injured."

Counsel and the court were familiar with the case of *People* v. *Conley* which had been tried before another judge in the same county and which had then been taken over by the Supreme Court, following an unpublished decision of the Court of Appeal (1 Crim. 4895, Oct. 1, 1965, hearing granted Nov. 30, 1965). No attempt was made, as was done in that case, to show diminished capacity or intoxication as theories upon which instructions regarding defendant's diminished capacity to entertain malice, or to deliberate and premeditate, could be predicated.[6] Defendant now attempts to find evidence of diminished mental capacity in the fact that the defendant was roused out of a sound sleep, went on an aimless trip, forgot some of the particulars (asking about employment in Cloverdale), and was vague and uncertain in his account of the trip. He conveniently overlooks his eagerness to establish his presence on the well-remembered route by recalling and reciting significant events which were subsequently corroborated. His original demonstration of observation, retention, and recall precluded subsequent reliance upon unconsciousness or diminished mental capacity after the victim's body was discovered.

On the facts in this case there was no error in the instruction given, or in failing to instruct on diminished capacity to deliberate or premeditate. Nor is there any merit in the contention that the instruction given offends the principle against "instantaneous reflection." (See *People* v. *Bender, supra,* 27 Cal.2d 164, 182-184 [163 P.2d 8].) It contains language, added to that derived from *People* v. *Thomas* (1945) 25 Cal.2d 880, 900 [156 P.2d 7] and criticized when standing alone (27 Cal.2d at p. 185), which is paraphrased from *Bender* (see 27 Cal.2d at p. 183).

---

[6]At the penalty trial a psychologist testified he interviewed the defendant, asked him a few general questions about his history, and began to administer psychological tests to the defendant, which he was unable to complete because of the defendant's petulance. He also examined records which indicated the defendant was a voluntary patient at Napa State Hospital in 1956 for two or three weeks. He diagnosed the defendant as a psychoneurotic, which he defined as "a rather broad category of mental illness in which, typically, the patient does not show bizarre symptoms, in which typically, the patient is not disoriented in terms of being confused as to who he is, where he is, what time of day it is, et cetera; but these symptoms may show up periodically, temporarily." He also stated: "I would conclude since 1952, approximately, we have evidence that Mr. Ray has had episodic periods of fearfulness, disorientation, moodiness. 'Disorientation' means having some clouding of consciousness or complete temporary lack of awareness of who he is, where he is, what he is doing; temporary periods in which there was disorientation, fearfulness, and moodiness. There were at least two suicidal efforts."

(3) The instruction on proximate cause (CALJIC 312, first three sentences) is criticized for failure to mention the element of foreseeability. (See *People* v. *Herbert* (1964) 228 Cal.App.2d 514, 519-521 [39 Cal.Rptr. 539].) In the case relied upon, there were several injuries prior to death, and a serious question of whether the injury occasioned by the act of the defendant could have been a proximate cause of the death. No such complexities beset this case. The victim was smothered, inferentially by a human agency, and the sole question was the identity of that person. In fact he further argues that an instruction on the subject was unnecessary. (Cf. *People* v. *Bernhardt* (1963) 222 Cal.App.2d 567, 591 [35 Cal.Rptr. 401].) If so, there was no prejudicial error in the form in which it was given.

(4) The instructions on reasonable doubt (CALJIC 21 and 22; and cf. 21 (rev.) and 22 (rev.) as found in 1967 Cumulative Pocket Part) are criticized for use of phrases which are meaningless. The former is prescribed by statute (Pen. Code, § 1096), and the latter, although not requested by defendant, as were the other instructions, has been upheld as a proper handmaiden to the statutory definition. (*People* v. *Kennelly* (1958) 166 Cal.App.2d 261, 264 [332 P.2d 733].)

(5) The instructions on circumstantial evidence (CALJIC 24, 25, 26, 27 and 28; and cf. 24 (1967 revision), 26 (rev.) as found in 1967 Cumulative Pocket Part) are attacked because they fail to intelligibly explain circumstantial evidence. Some of the obfuscation of which defendant complains has been eliminated by statutory revisions attendant to the adoption of the Evidence Code (see CALJIC 1967 revisions, *supra*). He, of course, would not change the rule requiring instructions, protective of the defendant, on the subject of circumstantial evidence. (*People* v. *Yrigoyen* (1955) 45 Cal.2d 46, 49-50 [286 P.2d 1].) He did not below, nor has he here, suggested a more perspicuous form of expression. Nor did he suggest to the trial court that the phrase "when the case" be revised to an absolute because of the nature of the evidence in this case. Unquestionably the jurors knew that the People's case depended on circumstantial evidence, and that they should apply the criteria set forth in these instructions.

(6) On *voir dire* a prospective juror observed: "I have worked in a mental hospital for eight years, and I can't believe that someone in their right mind can kill another person." The court thereafter stated: "If you were told in

this trial that under the law and the part of the case which you would be trying that it would be your duty to consider the defendant sane, then would that make any difference in the answers that you have given?" The prospective juror persisted in her views and was discharged.

Defendant suggests that this was an instruction to find the defendant of sound mind, and that such an instruction is proscribed because it conflicts with the right to show diminished capacity on the guilt phase of the trial. (*People* v. *Henderson* (1963) 60 Cal.2d 482, 491-494 [35 Cal.Rptr. 77, 386 P.2d 677].) The court's observation was not an instruction, but merely a question addressed to one juror, not all of the jurors. It was couched in hypothetical terms. No such instruction was given at the conclusion of the case. Moreover, as has been noted, there was no evidence of diminished capacity, and defendant did not urge or rely on that defense.

▇▇▇ (7) Finally, the defendant complains generally of redundant instructions which may have suggested to the jury the existence of facts which were not justified by the evidence—"jurors should not be encouraged to draw unreasonable inferences." (*People* v. *Hudgins, supra,* 236 Cal.App.2d 578, 582, and see pp. 585-586.) If there was a surfeit of instructions, defendant's requests contributed thereto. The court properly admonished the jurors not to consider any instruction which was not applicable to the facts as they found them. (CALJIC 8.)

No error is found in the instructions given by the court.

*Instructions—Manslaughter*

The record reflects that an instruction distinguishing between murder of the second degree and manslaughter (CALJIC 305), and one concerning resolution of a doubt as to which of those offenses was committed (CALJIC 305-AA (new)) were rejected by the court, as apparently were also any other instructions, not in the record, proposed by defendant on the subject of manslaughter.

▇▇▇ "It is settled that in criminal cases, even when not requested, the court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] [Fn. omitted.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case. [Citations.]" (*People* v. *Wilson, supra,* 66 Cal.2d 749, 759; accord: *People* v. *Con-*

968

*ley, supra,* 64 Cal.2d 310, 315-316; *People* v. *Henderson, supra,* 60 Cal.2d 482, 490; *People* v. *Modesto, supra,* 59 Cal.2d 722, 729; *People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281]; *People* v. *Lewis* (1960) 186 Cal.App.2d 585, 597 [9 Cal.Rptr. 263].)

 In this case defendant's absolute denial of any complicity in the smothering of his daughter leaves the record bare of any evidence to show voluntary or involuntary manslaughter in the ordinary sense.[7] The situation is governed by the following rules: "When the killing is proved to have been committed by the defendant, and nothing further is shown, *the presumption of law is that it was malicious and an act of murder*; but in such a case the verdict should be murder of the second degree, and not murder of the first degree.' (Italics added.) (*People* v. *Craig* (1957) 49 Cal.2d 313, 319 [316 P.2d 947], quoting from *People* v. *Howard* (1930) 211 Cal. 322, 329 [295 P. 333, 71 A.L.R. 1385]; accord, *People* v. *Terry* (1962) 57 Cal.2d 538, 556 [21 Cal.Rptr. 185, 370 P.2d 985]; *People* v. *Cole* (1956) 47 Cal.2d 99, 106 [301 P.2d 854, 56 A.L.R.2d 1435]; *People* v. *Bender* (1945) *supra,* 27 Cal.2d 164, 179.) . . .

 "These rules of substantive law are implemented by Penal Code section 1105, which provides that 'Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable.' It is true that this statute 'does not place on a defendant the burden of persuasion, but merely declares a rule of procedure that imposes on him a duty of going forward with evidence of mitigating circumstances.' (*People* v. *Deloney* (1953) 41 Cal.2d 832, 841 [264 P.2d 532].) Yet by the same token if the defendant fails to discharge the latter duty to the point of raising a reasonable doubt in the minds of the jurors, the presumption of malice will operate and the homicide will be deemed 'malicious

---

[7]Penal Code, section 192 provides in pertinent part: "Manslaughter is the unlawful killing of a human being, without malice. It is of three kinds: 1. Voluntary—upon a sudden quarrel or heat of passion. 2. Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; provided that this subdivision shall not apply to acts committed in the driving of a vehicle. 3. In the driving of a vehicle. . . ."

and an act of murder.' (*People* v. *Craig* (1957) *supra,* 49 Cal.2d 313, 319; see also *People* v. *Hall* (1963) 212 Cal. App.2d 480, 482 [28 Cal.Rptr. 164], and cases cited.)'' (*Jackson* v. *Superior Court* (1965) 62 Cal.2d 521, 525-526 [42 Cal. Rptr. 838, 399 P.2d 374].)

There was, therefore, no warrant for instructing on manslaughter on the grounds of a voluntary but provoked, or a negligent, killing. (See *People* v. *Ford, supra,* 65 Cal.2d 41, 57-58; *People* v. *Teale* (1965) 63 Cal.2d 178, 191-193 [45 Cal.Rptr. 729, 404 P.2d 209]; *People* v. *Carter, supra,* 56 Cal.2d 549, 564; *People* v. *Hudgins, supra,* 236 Cal.App.2d 578, 582-584; *People* v. *Furber* (1965) 233 Cal.App.2d 678, 686-687 [43 Cal.Rptr. 771]; and *People* v. *Bufarale* (1961) 193 Cal.App.2d 551, 559-563 [14 Cal.Rptr. 381]; and cf. *People* v. *Carmen, supra,* 36 Cal.2d 768, 772-777; and *People* v. *Lewis, supra,* 186 Cal.App.2d 585, 596-599.)

In *Conley,* however, the court discussed the principle of diminished responsibility and concluded: ''Accordingly, a finding of provocation sufficient to reduce murder to manslaughter is not the sole means by which malice can be negated and voluntary manslaughter established. A person who intentionally kills may be incapable of harboring malice aforethought because of a mental disease, defect, or intoxication, and in such case his killing, unless justified or excused, is voluntary manslaughter. (*People* v. *Henderson,* 60 Cal.2d 482, 490-491 [35 Cal.Rptr. 77, 386 P.2d 677]; *People* v. *Gorshen, supra,* 51 Cal.2d 716, 732 [336 P.2d 492]; *People* v. *Bender, supra,* 27 Cal.2d 164, 180.)'' (64 Cal.2d at p. 318.)

If there is evidence of such mental disease, defect, or intoxication it is error to fail to instruct on the distinction between murder and manslaughter. (*People* v. *Conley, supra,* 64 Cal.2d 310, 315-320; *People* v. *Henderson, supra,* 60 Cal.2d 482, 489-491; *People* v. *Modesto, supra,* 59 Cal.2d 722, 727-731.)

There is no reason to believe that the defendant should not be under the same burden of going forward with the evidence on this issue. (See *Jackson* v. *Superior Court, supra.*) In *Conley* the court observed: ''Accordingly, the introduction of any evidence deserving of consideration that defendant lacked any one of these mental states entitled him to an instruction as to the effect of this lack.'' (64 Cal.2d at p. 319.) In *Ford* the court noted: ''In our decision in *People* v. *Conley, supra,* 64 Cal.2d 324, which was rendered after Justice Schauer's opinion in the earlier appeal, we held that

it was prejudicial error to refuse to instruct on manslaughter in a homicide case where evidence of diminished mental capacity and intoxication was introduced by the defense." (65 Cal.2d at p. 58.)

The evidence upon which defendant relies to raise the issue of diminished responsibility has been discussed above (fn. 6, *supra,* and text.) It was not alluded to in discussing the instructions with the court, nor was any attempt made to argue the defense of diminished responsibility to the jury; nor is it "deserving of consideration." Defendant persisted in his innocence and at no time claimed an inability to remember the occurrences of what was inferentially the last day of life for his daughter.

The case is like *People* v. *Wade* (1959) 53 Cal.2d 322 [1 Cal. Rptr. 683, 348 P.2d 116]: "At the trial an instruction on second degree murder was requested by defendant's attorney but refused by the court. Defendant did not then advance any plausible theory of the facts of the case to support a verdict of murder in the second degree though he was requested to do so by the court." (53 Cal.2d at p. 333.) The court concluded: "This court has often counseled against the giving of instructions not justified by the facts of the case as tending to overburden and confuse the jurors. An instruction, apparently unrelated to the case before it, will be no less confusing to the jury because a theory to connect it to the facts actually exists and later is discovered. It was, therefore, proper for the trial court to disregard the request for the instruction on murder in the second degree." (*Id.*)

In response to the suggestion that the court should instruct on its own initiative, the opinion states: "[T]he trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly. The judge need not fill in every time a litigant or his counsel fails to discover an abstruse but possible theory of the facts. . . .

"Defendant's theory of the case was not one that the evidence would strongly illuminate and place before the trial court. On the contrary, it was so far under the surface of the facts and theories apparently involved as to remain hidden from even the defendant until the case reached this court on appeal. The trial court need not, therefore, have recognized it and instructed the jury in accordance with it. Omniscience is not required of our trial courts." (*Id.*, pp. 334 and 335.)

Here the court, on the record before it, properly concluded

that an instruction on manslaughter was unrelated to the facts adduced, and would only lead to a compromise verdict. There was no error in failing to instruct the jury on manslaughter.

*Misconduct*

 (1) Defendant's first assignment of misconduct by the prosecutor is related to the question of whether there was any factual issue which would justify a finding of manslaughter. Near the beginning of his opening argument he advised the jurors, "[Y]ou will not be instructed in manslaughter. It drops out of the case. You will be concerned only then with whether this case is second degree murder or first degree murder."[8]

Defendant construes these remarks as a declaration that the malice necessary to establish murder of either degree was established as a matter of law. There is no merit to this claim. The prosecutor had already acknowledged that he had to prove defendant's guilt beyond a reasonable doubt and to a moral certainty; and he subsequently argued that the facts established malice. The court's instructions emphasized this element of the crime. On the state of the evidence, which has been discussed above in connection with the instructions, there was no error in the statement of the prosecutor. It was within the realm of proper argument.

 "Remarks made by a prosecuting attorney are within the scope of permissible argument if they are based upon a reasonable interpretation of the evidence, it being settled

---

[8]The full context of the remarks is as follows: "The charge in this case is murder. And reviewing the law for a moment on that charge, as indicated earlier in this case, homicide involves four possibilities in cases of this sort: Not guilty; manslaughter; second degree murder; or first degree murder.

"Now, when a person is unlawfully killed, the presumption is that it is second degree murder at that point, if that is all that is shown.

"The question as to whether or not manslaughter is involved, brings into the case matters such as provocation; that the victim provoked the attack; that the victim did something that a reasonable man would have retaliated with killing; that the killing at that time, at that point, shows the absence of any malice, because it was provoked or was done in a heat of passion. It is excusable or mitigates it, reduces it from the second degree murder to manslaughter.

"In this case, there is no evidence, none whatsoever, if any such a situation arising. There is no provocation. This seven year old girl didn't provoke something. There is no evidence of a heat of passion at the moment of the killing within a meaning of the manslaughter area of the law; so, therefore, you will not be instructed in manslaughter. It drops out of the case. You will be concerned only then with whether this case is second degree murder or first degree murder."

that a prosecuting attorney may argue any matter helpful to his case, provided he confines himself to the record and those inferences which may reasonably be drawn therefrom. [Citations.]" (*People* v. *Roberts* (1966) 65 Cal.2d 514, 520 [55 Cal.Rptr. 412, 421 P.2d 420]; and see *People* v. *Mason* (1960) 184 Cal.App.2d 317, 364 [7 Cal.Rptr. 627]; cf. *People* v. *Perez* (1962) 58 Cal.2d 229, 241-247 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946]; and *People* v. *Talle* (1952) 111 Cal. App.2d 650, 676-678 [245 P.2d 633].) "A trial court in its discretion may permit counsel to state correct law and illustrate its application to the facts. [Citation.]" (*People* v. *Linden* (1959) 52 Cal.2d 1, 29 [338 P.2d 397]; and see *People* v. *Jones* (1962) 205 Cal.App.2d 460, 466-467 [23 Cal.Rptr. 418].)

(2) The same considerations govern defendant's contention that the prosecutor misled the jury in indicating that there was an hour unaccounted for in defendant's circuitous trip on the day the girls disappeared. Defendant claims that the prosecutor fails to take into account defendant's allegedly admitted stops to get gas, to talk to a truck driver, to make a phone call, and to inquire about a job. He alleges that there was no time left for defendant to perform the foul deed attributed to him, and also that the times and places the witnesses testified they saw him made it impossible for him to be the culprit. This approach is merely an attempt to reargue and reweigh the evidence and the inferences to be drawn therefrom. The prosecutor made no attempt to conceal that stops were made. He directed the jurors' attention to the fact that there was an hour to be accounted for in addition to the driving time. It was for them to draw the appropriate inferences as to whether the defendant himself did dispose of the girl's body and, if so, in what manner.

Moreover, it should be noted that defendant's present objections are not of such substance that they may be raised on appeal when no objection or request for correction was made in the trial court. (*People* v. *Talbot* (1966) 64 Cal.2d 691, 711 [51 Cal.Rptr. 417, 414 P.2d 633]; *People* v. *Mitchell* (1966) 63 Cal.2d 805, 809 [48 Cal.Rptr. 371, 409 P.2d 211]; *People* v. *Ney* (1965) 238 Cal.App.2d 785, 790-791 [48 Cal. Rptr. 265]. Cf. *People* v. *Perez, supra,* 58 Cal.2d 229, 247.)

No misconduct is found in defendant's assignments of error in the prosecutor's argument to the jury.

*Custody and Restraint of the Accused.*

Section 688 of the Penal Code provides: "No person can be

compelled, in a criminal action, to be a witness against himself; nor can a person charged with a public offense be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge." It is a violation of the common law and of the foregoing provisions to require a prisoner, during the progress of the trial before the court and jury, to appear and remain with chains and shackles upon his limbs in the absence of evident necessity for such restraint. Where such practice is persisted in over objection a resulting conviction may be reversed. (*People* v. *Harrington* (1871) 42 Cal. 165, 168-169 [10 Am.Rep. 296].)

When cause is shown, the defendant cannot complain of reasonable and necessary provisions for his custody (*People* v. *Hillery* (1967) 65 Cal.2d 795, 805-806 [56 Cal.Rptr. 280, 423 P.2d 208]; *People* v. *Burwell* (1955) 44 Cal.2d 16, 32-33 [279 P.2d 744]; *People* v. *Kimball* (1936) 5 Cal.2d 608, 609 [55 P.2d 483]; *People* v. *Stabler* (1962) 202 Cal.App.2d 862, 863-864 [21 Cal.Rptr. 120]; *People* v. *Howard* (1955) 135 Cal.App.2d 95, 99-100 [286 P.2d 454]; *People* v. *Harris* (1950) 98 Cal.App.2d 662, 664-665 [220 P.2d 812].) The mere presence of a peace officer who is obviously charged with the responsibility of the custody of the defendant is not considered prejudicial (*People* v. *David* (1939) 12 Cal.2d 639, 644 [86 P.2d 811]; *People* v. *Harris, supra,* 98 Cal.App.2d 662, 664-665); and the fact that a witness who had testified for the defendant was manacled for his return to jail, in the presence of the jury when court adjourned, has been held to be reasonable. (*People* v. *Metzger* (1904) 143 Cal. 447, 448-449 [77 P. 155].)

 In the absence of a record this court cannot determine whether or not there has been prejudicial error. (See *People* v. *Hillery, supra,* 65 Cal.2d 795, 805-806; and *People* v. *Howard, supra,* 135 Cal.App.2d 95, 99-100.) On *voir dire,* the defendant asked a prospective juror who had already acknowledged actual bias (Pen. Code, § 1073, subd. Second), "Now, is there something in the fact Mr. Ray has been handcuffed and brought into the court in handcuffs that makes you think that everybody thinks he might be guilty?" (The juror answered this question in the negative, but was subsequently excused for cause.) No further mention of restraint is found until the beginning of the penalty phase of the trial. The proceedings before the jury were interrupted to consider defendant's objections to the People's proposed evidence, and defendant then for the first time interposed an objection to

the restraints allegedly imposed on him.[9] On the record before us no error or abuse of discretion appears from the order of the court overruling the objection which was made at that stage of the proceedings.

Defendant moved this court to augment and correct the record with declarations of the attorney for the defendant and the judge.[10] The motions were denied because there was not only no showing that a timely objection had been made in the court below, but also no showing that the matter in the declaration had been presented to the trial court in connection with the motion for new trial. (*People* v. *Buck* (1941) 46 Cal. App.2d 558, 560-561 [116 P.2d 160].)

---

[9]The following ensued: ''Another thing I want to object to at this time is the way the Defendant has been hustled back and forth here today, handcuffed and held by one arm and brought right past through the Jury into the Courtroom. And I want to object to the Deputy Sheriff now sitting right off his left-hand arm in front of the bar as though he was about to throw a bomb or jump up here. I objected once earlier in the trial and they stayed out behind the bar here.

''In these cramped quarters here, there are other people sitting in front of the bar that are having some effect on the progress of the case. I can sit here and hear all sorts of remarks, and it would be highly prejudicial. I don't know if the Jury has been able to hear these or not, but they have been said in the Courtroom and it is a danger that we are faced with.

''[Prosecutor]: Your Honor, for the record in that regard I would like to make this statement, that the Defendant has been brought directly from the jail to the Courtroom in the only manner possible to bring him. On each of the times that it has been necessary to bring him back here. That the effort of handling him in this Courtroom is not inconsistent with the way the Defendant has been handled in all trials in this Courtroom. That because of the crowded Courtroom it has been necessary for certain of the chairs behind the bar to be used by members of the press and others. It is therefore nothing that we can do with the physical facilities.

''I will also say that I have heard no remark made by anybody behind me that has registered upon me at any time during this trial. And I am sitting closer to the Jury than the Defendant or the defense counsel.

''The Court: The objection will be overruled. The means used to retain in custody, I think, are reasonable.''

[10]The declaration of the judge discloses: ''That during the course of the trial, the defendant, Claude Ray, Jr., was regularly and continuously brought handcuffed from the jail to the courtroom. Prisoners must traverse a public corridor from the jail to the courtroom. The handcuffs were removed each time as soon as the defendant had entered the courtroom. The jury could see the defendant traversing the corridor or when he reached the courtroom. . . . That declarant has no knowledge of any conduct on the part of the defendant either before or during the trial which would necessitate handcuffing him in going to and from the courtroom but deemed it necessary to guard against escape and to protect the public. The defendant was not handcuffed at any time while court was in session.'' It further appears that the attorney, as public defender, had voiced objection to the practice in other proceedings which had been overruled, because—according to the judge—they were cases in which a defendant had previously escaped.

Moreover, even if the facts were before this court, it would not present a matter for consideration because of the failure to make timely objection when the practice complained of was first observed. (*People* v. *Deveney* (1952) 112 Cal.App.2d 767, 770 [247 P.2d 128] ; *People* v. *Buck, supra,* 46 Cal.App.2d 558, 562; and see *People* v. *Burwell, supra,* 44 Cal.2d 16, 32.) Defendant cannot rely upon the rulings in other cases to excuse the failure to make a timely objection. In the first place, the circumstances were allegedly different, and, secondly, it cannot be presumed that a judge will persist in error, if error it be. The timely objection would have given an opportunity for the court to weigh the possible prejudice against the responsibilities of the sheriff charged with the defendant's custody, and, if proper, for it to make such order as necessary ameliorating the situation or cautioning the jury. (See *People* v. *David, supra,* 12 Cal.2d 639, 644; *People* v. *Kimball, supra,* 5 Cal.2d 608, 611; *People* v. *Stabler, supra,* 202 Cal.App.2d 862, 864; and *People* v. *Harris, supra,* 98 Cal.App.2d 662, 664-665.)

In any event, the practice revealed cannot be said to be erroneous. The jurors knew that the defendant had been arrested and charged with the offense, and that he was in the custody of the sheriff. ''In many cases it is proper, and it is often necessary as a precaution, to manacle a prisoner to secure his safe conduct and guard against an escape while on the way from the jail to the courtroom. An improper motive will therefore not be inferred or presumed from the mere fact that it is done.'' (*People* v. *Metzger, supra,* 143 Cal. 447, 449.) In other words, the law and the jurors may well recognize the restraint as a standing operating procedure without any significance as to the propensities of the particular defendant. There is no constitutional privilege which entitles each accused, who is in custody, to one escape.

No error has been demonstrated in the treatment of the accused.

### Conclusion

Defendant points to some inconsistencies in the facts and some unexplained facts as rendering the whole evidence of guilt equivocal as a matter of law, or of such tenuous nature that the finding of guilt should be upset for any or all of the reasons which the diligence and perspicacity of counsel have advanced on appeal.

The case was fairly and impartially tried to the credit of

judge, prosecutor and defense counsel, and the conflicts in the evidence were resolved against the defendant. His threats, the fact that he was admittedly the last person to see the girls before their disappearance, his presence at the time and vicinity where Renay's body was presumably last seen and touched by another, and his post-disappearance statements combine to furnish the circumstances which sustain the findings of the jury.

Whether the dollar he received from his wife was to be given to the girls to take to school, or whether he was to buy milk and keep the change, was not the significant point of the jury's question concerning the money he received. The incriminating fact was that he had the dollar with which to buy gas, and had neither given it to the girls nor bought and furnished them milk.

Defendant also seeks review of the weight to be given, and the inferences to be drawn from, the evidence concerning the time of the trip, the breakfast eaten by the victim, and the condition of her stomach at death. These matters were all properly before the trier of fact.

One can but note a certain parallelism with *People* v. *Nicolaus, supra,* 65 Cal.2d 866, in which a father's convictions of first degree murder of each of his three children, with the death penalty imposed, were reduced to second degree murder. There, however, ''both the expert and non-expert testimony established conclusively that defendant was not a normal person either mentally or emotionally.'' (P. 878). In this case defendant claimed that he was not present at and never committed or took part in committing the homicide of his daughter. His mental condition never became an issue at the guilt trial. (Cf. *People* v. *Price* (1965) 63 Cal.2d 370, 379-380 [46 Cal.Rptr. 775, 406 P.2d 55]; and *In re Spencer* (1965) 63 Cal.2d 400, 412 [46 Cal.Rptr. 753, 406 P.2d 33].) It is now fruitless to speculate as to whether another approach was possible or would have been more fruitful for the defendant. The evidence of prior threats, and defendant's recollection of the events of his drive distinguish this case from *Nicolaus* and deflate the balloon of diminished capacity before it can be launched, despite the fact that the bizarre nature of the offense lends credence to the prospective juror's observation, ''I can't believe that someone in their right mind can kill another person.''

There being no error in the record, and no evidence other

than the nature of the homicide itself to show diminished capacity, the judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied August 22, 1967, and appellant's petition for a hearing by the Supreme Court was denied September 21, 1967.